UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIM C. BLOCK, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>INTEROIL CORPORATION, EXXON MOBIL CORPORATION, MICHAEL HESSION, CHRISTOPHER FINLAYSON, CHEE KEONG YAP, DR. ELLIS ARMSTRONG, FORD GRANT NICHOLSON, ISIKELI REUBEN TAUREKA, SIR WILSON KAMIT, and SIR RABBIE L. NAMALIU,<br><br>                Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br><br>CLASS ACTION<br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT**

Plaintiff Kim C. Block ("Plaintiff") makes the following allegations based on the investigation of Plaintiff's counsel, which included, *inter alia*, a review of: the Management Information Circular for a Special Meeting of Holders of Common Shares, Options and Restricted Share Units of InterOil Corporation with Respect to an Arrangement Involving InterOil Corporation and Exxon Mobil Corporation, dated January 13, 2017 (the "Information Circular"); documents publicly filed by InterOil Corporation ("InterOil") and Exxon Mobil Corporation ("Exxon"); wire and press releases; securities analysts' reports; media reports; information provided by Philippe E. Mulacek ("Mulacek"), founder and former Chairman of InterOil; and other public statements issued by InterOil and Exxon. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action brought on behalf of all persons other than Defendants who purchased or otherwise acquired Exxon shares worth $45.00 and a contingent resource payment (the "CRP") for each outstanding InterOil share in connection with the acquisition of all of the issued and outstanding shares of InterOil by an affiliate of Exxon (the "Acquisition"), and who are seeking to pursue remedies under §12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77l(a)(2).

## PARTIES

2.       Plaintiff held approximately 7,850 shares of InterOil stock as of January 10, 2017, the record date of the Acquisition (the "Record Date"). As a result of the Acquisition, Plaintiff was forced to sell her InterOil shares and purchase Exxon shares and the CRP.

3.       Defendant InterOil was a publicly-traded oil and gas company listed on the New York Stock Exchange (the "NYSE") prior to the Acquisition. InterOil was incorporated in Yukon Territory, Canada, and headquartered in Singapore, with additional offices in Port Moresby, Papua

New Guinea ("PNG").   InterOil engaged in the exploration, appraisal and development of hydrocarbon resources.  Its primary assets were (i) a gross 36.5% interest in petroleum retention license 15 ("PRL 15") in the Gulf Province of PNG, which includes the world-class Elk and Antelope gas fields (the "PRL 15 License Interest"), and (ii) the right to receive substantial future payments from French oil and gas supermajor TOTAL, S.A. ("TOTAL"), arising out of TOTAL's 2014 purchase from InterOil of a gross 40.19% license interest in PRL 15 (the "TOTAL Payments"). The TOTAL Payments are calculated based on certified "in the ground" estimates of the total hydrocarbon resources of the Elk and Antelope gas fields to be prepared by certain designated independent third-party estimators according to an industry standard commonly referred to as "2C" (the "PRL 15 2C Resource Estimate").  Under the TOTAL sale documents, the process of preparing the PRL 15 2C Resource Estimate is referred to as the "Interim Resource Certification."  InterOil's additional assets included other interests in petroleum exploration and retention licenses covering an area of approximately 16,000 square kilometers in the Gulf Province of PNG.  InterOil was the operator of PRL 15 until TOTAL assumed operations on August 1, 2015.

4.      Defendant Exxon is the largest integrated oil and gas company in the world, with a market capitalization exceeding $350 billion.   Exxon is incorporated in New Jersey and headquartered in Irving, Texas.  Exxon explores and produces crude oil and natural gas in the United States, Canada, South America, Europe, Africa, Asia and Australia/Oceania.  It also manufactures petroleum products and petrochemicals, in addition to selling and transporting crude oil, natural gas, and petroleum products.

5.      Defendant Michael Hession ("Hession") was at all relevant times hereto a director and CEO of InterOil.  Hession signed the Information Circular.

6.      Defendant Christopher Finlayson ("Finlayson") was at all relevant times hereto Chairman of the Board of Directors of InterOil and a member of the committee created by the board

of directors of InterOil (the "Board") to oversee the Acquisition (the "Transaction Committee"). Finlayson signed the Information Circular.

7.     Defendant Chee Keong Yap ("Yap") was at all relevant times hereto a director of InterOil and member of the Transaction Committee.

8.     Defendant Dr. Ellis Armstrong ("Armstrong") was at all relevant times hereto a director of InterOil and member of the Transaction Committee.

9.     Defendant Ford Grant Nicholson ("Nicholson") was at all relevant times hereto a director and the Deputy Chairman of InterOil, and a member of the Transaction Committee.

10.    Defendant Isikeli Reuben Taureka was at all relevant times hereto a director and executive vice president – Papua New Guinea of InterOil.

11.    Defendant Sir Wilson Kamit was at all relevant times hereto a director of InterOil.

12.    Defendant Sir Rabbie L. Namaliu was at all relevant times hereto a director of InterOil.

13.    The defendants identified in ¶¶5-12 are collectively referred to as "Individual Defendants," and the defendants identified in ¶¶3-12 are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2).

15.    This Court has jurisdiction over this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

16.    Venue is proper in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  Exxon maintains its headquarters in this District and many of the acts and conduct

that constitute violations of law complained of herein occurred in this District, including dissemination of the materially false and misleading Information Circular.

17.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE.

## SUBSTANTIVE ALLEGATIONS

**Background**

18.     InterOil was a publicly traded oil and gas company with two primary assets: the PRL 15 License Interest and the Total Payments.  In early 2015, the Board decided to explore the sale of minority interests in some of InterOil's assets.  The Board began contacting potentially interested parties in September of 2015.  Toward the end of 2015, the Board approached a select group of four oil and gas companies about engaging in a larger minority investment transaction with respect to some of InterOil's assets, with the possibility of the investor also becoming the operator of those assets.  The companies approached were: Exxon, Oil Search Limited ("Oil Search"), "Party B" (as referred to in the Information Circular), and a party who declined to participate.  In response, Exxon informed InterOil and its directors in December 2015 that it was considering acquiring all of InterOil's outstanding shares, instead of a minority interest only.  InterOil's management engaged in a high level preliminary discussion with Exxon that month regarding Exxon's new proposal.  Shortly thereafter, a number of InterOil insiders, including Defendants Hession, Armstrong, and Finlayson, purchased InterOil shares prior to Exxon's interest in acquiring InterOil was made public.

19.     On March 1, 2016, InterOil signed a confidentiality agreement with Exxon concerning the possible whole-company acquisition.  On March 3, 2016, Exxon provided InterOil with an indicative proposal, but InterOil determined that the proposal was not sufficient to merit further negotiations at that time.

20.     Later, on March 11 and March 14, 2016, respectively, both Party B and Oil Search submitted non-binding indicative proposals to acquire all of the issued and outstanding shares of InterOil.  With three proposals on the table, on March 16, 2016, the Board authorized management and InterOil's advisors to continue discussions with Exxon, Party B, and Oil Search to determine whether one or all of the proposals could be improved.  The Board also appointed the Transaction Committee at this time, consisting of non-executive directors Finlayson, Nicholson, Yap, and Armstrong.

21.     Ultimately, Party B decided not to revise its offer, but both Oil Search and Exxon later submitted revised, written non-binding indicative proposals on April 29, 2016 and May 6, 2016 respectively.  On May 10, 2016, the Board authorized InterOil's representatives to inform Exxon that its May 6th revised proposal was inadequate.  On May 20, 2016, InterOil announced that it had entered into an agreement with Oil Search for Oil Search to acquire all of the issued and outstanding shares of InterOil (the "Oil Search Agreement").

22.     During the bidding process, InterOil conducted earnings calls on March 30, 2016 and May 13, 2016 with select brokers and analysts who follow InterOil's stock.  During the March 30, 2016 earnings call, Hession explained that InterOil and the other entities that hold joint venture license interests in PRL 15 and the Antelope Field were contemplating whether to drill another appraisal well to determine the volume uncertainties of the western flank of the Antelope Field ("Antelope-7").  According to the transcript of the call, Hession made it "absolutely clear" that InterOil would agree to drill Antelope-7 only if doing so "would add significant value for our InterOil shareholders."  In relevant part, Hession stated:

> While the JV is yet to make a decision [sic] I can assure you that InterOil was only agreeing to [Antelope-7], *if is absolutely clear, that it would add significant value for our InterOil shareholders*. If we do not drill Antelope-7, we expect to initiate [the Interim Resource Certification] in the near future. This is a very important decision, and we expect to make that decision soon.

\*      \*      \*

*But there is one thing that I think I've been absolutely consistent about, we will only agree to Antelope-7 and this is (inaudible) because as you say, it requires unanimity. We will only agree to Antelope-7 if it delivers material upside to our shareholders*. That's the only lengths that Antelope cannot be driven. But I'll go back to today, there is no Antelope-7, it will be a JV decision, and we will work it through that at the moment.

23.     During the earnings call on May 13, 2016, Hession stated InterOil management's view that Antelope-7 had **"*multi-tcfe upside*"** and could potentially increase resource estimates ***by 3 trillion cubic feet equibalent ("tcfe").*** In relevant part, Hession stated:

Now, a key question that is remaining and that's about the extent of the field at western flank and whether we should drill Antelope-7. *The target – multi-TCFE upside, I repeat. Upside*, and that's the size of the price.

\*      \*      \*

I mean, the fact we've got Antelope-7 even on the table is a very, very positive outcome. As David [Kirk, Senior Vice President, Development and Drilling] said, when we put Antelope-5 in the ground, we expected to be testing the western flank. Well, that proved actually it could be much further out to the west. So very simply, the field has got bigger. *And so Antelope 7 is all about chasing that western flank, which may well be constrained by the fault*.

As David [Kirk] said on a number of occasions and I have said on a number of occasions, that got multi-Tcfe, multi-Tcfe possibility of an outcome.

\*      \*      \*

I mean, the fact of the matter is volumes are trending up. And whenever myself (inaudible) talked about this. GLJ, their view of the reservoir as we continually drill [Antelope appraisal wells] four, five and six GLJ again and again are being proved to be more correct with respect to the reserves and the nature of the geology that we are dealing with.

But if I draw you back to why are we doing this and there is [sic] *two major value-adds here*. First of all, the value-add for the venture. 3 Tcfe is a significant amount of gas and that can deliver a significant amount of value to the joint venture and we would have upside potentially even further the facilities to make sure that we capture that value appropriately. But the very significant nuance, and I know you are well aware of this, Evan, is the fact that up to 3 Tcfe, we will have a massive effect on the certification payment, and as I have said before, $400 million per Tcfe. So if you are in a space or we are in a space up to 3 Tcfe, where you can see, that's a very significant payment to us at InterOil.

*       *       *

[We've] all said, [the Antelope Field] is a giant, she continues to behave like a giant, the appraisal is delivering on the upside and we are even more confident we've got a two-train development and there is more Tcf upside in Antelope-7.

*       *       *

*If there is indeed another 3 Tcfe [in the Antelope Field], there is a lot more value that could be harvest from this field if you build the field facilities appropriately.*

24.     Then, on June 23, 2016, InterOil received an unsolicited, non-binding proposal from Exxon to acquire all of the issued and outstanding shares of InterOil, prompting the Board to meet and discuss the proposal with its advisors.  The Board decided that Exxon's offer was superior and gave Oil Search until July 21, 2016 to revise its offer, which Oil Search failed to do.  On July 21, 2016 InterOil terminated the Oil Search transaction, paid a $60 million termination fee to Oil Search, and entered into an acquisition agreement with Exxon (the "Original Arrangement Agreement").

25.     Under the terms of the Original Arrangement Agreement, Exxon would acquire all issued and outstanding common shares of InterOil for (i) $45.00 per InterOil share payable in Exxon shares, and (ii) the CRP, which would pay approximately $7.07 per InterOil share for each 1 tcfe of PRL 15 2C Resources above 6.2 tcfe, up to a maximum of 10 tcfe.  No payment would be made on account of PRL 15 2C Resource Estimate in excess of 10 tcfe.

26.     The Original Arrangement Agreement provided that the InterOil shares would be acquired pursuant to a statutory plan of arrangement under Yukon Law (the "Plan of Arrangement"). For closing to occur, the Yukon Supreme Court was required to find that the Plan of Arrangement was "fair and reasonable."

27.     On July 21, 2016, Morgan Stanley & Co. LLC ("Morgan Stanley"), InterOil's financial advisor at that time, provided its opinion to the Board that the consideration offered was fair from a financial standpoint (the "Morgan Stanley Fairness Opinion").  As described below, the Yukon Court of Appeal later found the Morgan Stanley Fairness Opinion to be severely lacking in a

number of critical areas.  In addition, the Board members were highly incentivized to execute the Original Arrangement Agreement because they would receive immediate vesting of their significant number of unvested stock options or restricted share units ("RSUs").

28.     On September 21, 2016, InterOil shareholders voted in favor of the Original Arrangement Agreement.  At the fairness hearing before the Yukon Supreme Court on September 27, 2016, Mulacek, founder and former Chairman of InterOil, challenged the fairness and reasonableness of the Original Arrangement Agreement.  In support of his position, Mulacek proffered both opinion evidence from a leading Canadian corporate governance expert, Peter Dey ("Dey"), and an affidavit from an expert in the "valuation of reserves and resource estimates for the oil and gas industry," John Booth ("Booth").  Dey stated that "the process undertaken by the Interoil Board in considering and recommending the [Plan of Arrangement] . . . was deficient, and failed to meet current governance best practice and to ensure adequate safeguards of shareholder interests." Booth's affidavit stated that, in direct contrast to the Morgan Stanley Fairness Opinion, the Plan of Arrangement was "inadequate, from a financial point of view, to the shareholders of InterOil."  The Supreme Court of Yukon noted that both Dey and Booth had raised serious issues of disclosure, process, and fairness in connection with the negotiation and corporate approval of the Plan of Arrangement and Original Arrangement Agreement.  Nonetheless, on October 7, 2016, despite explicit misgivings, the Supreme Court of Yukon approved the Plan of Arrangement. Mulacek appealed.

29.     On November 2, 2016, after the Supreme Court of Yukon had issued its opinion, TOTAL began drilling (also referred to as "spudding") Antelope-7 – the final appraisal well that would be drilled prior to the commencement of the Interim Resource Certification process.  The Interim Resource Certification process involves multiple valuation experts estimating the PRL 15 2C Resources in the Antelope Field based, in large part, on data provided by the appraisal wells,

including Antelope-7.  Given that the size of the CRP is entirely dependent on the PRL 15 2C Resource Estimate, the CRP was highly dependent on the quality of data collected from Antelope-7. Antelope-7 was intended to answer very important questions about the Antelope Field, including the limits of the Antelope reservoir, the productivity of the wells, and the characteristics of the oil or gas. Consequently, the location of Antelope-7 was of paramount importance, as misplacement could inaccurately suppress the eventual PRL 15 2C Resource Estimate, costing InterOil shareholders hundreds of millions to billions of dollars in lost merger consideration.

30.    To accomplish these objectives, InterOil and TOTAL intended to start Antelope-7 to the west of the top of the Antelope reservoir and drill vertically downward until the western downslope of the field was intersected – the higher the intersection, the father west the field extended.  Once the field was intersected, additional data on the field could also be obtained. Conversely, if Antelope-7 failed to intersect the field at all, InterOil and TOTAL would have no significant additional information about the field other than it did not extend as far west as the Antelope-7 well.  In such a situation, InterOil and TOTAL would have wasted significant time and resources without receiving data to support an increase in the estimated size of the Antelope field, the PRL 15 2C Resource Estimate, or the CRP.  To date, Antelope-7 has cost more than $300 million.

31.    Notably, Mulacek informed InterOil that Antelope-7 was being drilled in the wrong location prior to spudding of Antelope-7.  As Mulacek explained, Antelope-7 needed to target the structural top of the Antelope reservoir, and then drill directionally to the west within the reservoir rock to establish the limits of the Antelope reservoir and provide the sought-after information regarding the productivity of the wells and the characteristics of the oil or gas.  Mulacek's approach would have actually accomplished the stated goals for Antelope-7, as drilling would have started in an already-proven portion of the Antelope reservoir and then tested how far it extended, rather than

starting outside the already-proven portion of the field and hoping to intersect it.  Despite the fact Mulacek was the primary founder of InterOil and, as a Petroleum Engineer, had significant applicable expertise regarding InterOil's drilling and location selection for well operations, InterOil, with Exxon and TOTAL, ignored his advice and spudded Antelope-7 in their originally intended location.

32.     Two days later, on November 4, 2016, the Court of Appeal of Yukon upheld Mulacek's appeal and overturned the Supreme Court of Yukon's decision that the Plan of Arrangement was "fair and reasonable."  The Court of Appeal based its finding on, *inter alia*, the following "red flags":

(a)     the absence of a fairness opinion from an independent expert;

(b)     the failure of Morgan Stanley to assess the value of the CRP as compared with the value InterOil shareholders would receive by retaining their shares;

(c)     the deficiencies in process pointed out by Mr. Dey;

(d)     the unchallenged report of Mr. Booth that the Original Agreement was "unfair" to InterOil shareholders;

(e)     the fact the CEO was in a position of conflict;

(f)     the probability the "independent" special committee was not independent of management; and

(g)     the lack of "necessity" for the deal.

33.     The Court of Appeal also noted that the independent committee seemed "fairly passive, merely receiving reports from management who led the negotiations."  These red flags, according to the Court of Appeal, required the Supreme Court of Yukon "to do more than accept the vote of the majority as a 'proxy' for fairness, or the cash amount of Exxon's offer as a proxy for reasonableness."  Ultimately, the Court of Appeal determined it could not say the Plan of

Arrangement "ha[d] been shown to be fair and reasonable." This finding terminated the Plan of Arrangement and required Exxon and InterOil to agree on a new plan of arrangement, subject to another approval by both InterOil's shareholders and the Supreme Court of Yukon.

34.     Despite the litany of shortcomings in the Plan of Arrangement identified by the Court of Appeal, including the lack of an effective Transaction Committee, the Board reconvened the Transaction Committee with the same directors serving as members, and tasked the Transaction Committee with, *inter alia*, reviewing the new plan of arrangement. At this point, the Transaction Committee finally obtained independent counsel and began holding regular meetings. On November 18, 2016, the Transaction Committee retained BMO Nesbitt Burns Inc. ("BMO") as independent financial advisor. It also requested that GLJ Petroleum Consultants Ltd. ("GLJ") produce an updated contingent resource report for PRL 15.

35.     On November 30, 2016, GLJ provided its updated report (the "GLJ 2016 Report"), which indicated its estimate of the PRL 15 2C Resources was now 7.8 tcfe (down from its previous best estimate of 10.20 tcfe as of December 31, 2015). GLJ attributed its new lower estimate primarily to data collected from the Antelope-6 appraisal well. However, InterOil did not release the GLJ 2016 Report, so it is unclear whether any material changes in assumptions also factored into the reduced estimate and, if so, whether such material changes in assumptions were directed to be included by InterOil and/or Exxon.

36.     On December 8, 2016, Exxon delivered its draft amended and restated acquisition agreement (the "Amended Arrangement Agreement"), which included a revised plan of arrangement (the "Revised Plan of Arrangement") that included two material changes from the original Plan of Arrangement: (1) a deceptive increase of the CRP cap from 10 tcfe to 11 tcfe; and (2) an increase in the termination fee from $60 million to $100 million to compensate Exxon for the delay. As will be discussed in more detail below, the increase in the CRP cap from 10 tcfe to 11 tcfe was an illusory

benefit intended only to entice InterOil shareholders to approve the Acquisition.   In reality, Defendants knew the increase of the CRP almost certainly provided no additional value for InterOil shareholders.

37.     Shortly after Exxon delivered the Amended Arrangement Agreement to InterOil, Antelope-7 experienced its first in a series of misses of its geological targets.  On or about December 12, 2016, Antelope-7 failed to intersect the top of the Antelope Field carbonate formation at its shallowest predicted depth of 1,804 meters.  On December 14, 2016, Antelope-7 failed to intersect the top of the Antelope Field carbonate formation at its most likely predicted depth of 1,984 meters.

38.     The following day, the Board unanimously voted in favor of the Acquisition under the Revised Plan of Arrangement and entered into the Amended Arrangement Agreement.  In a December 15, 2016 press release issued by InterOil providing an update on the Acquisition, InterOil described the increase in the CRP cap as "an increase from the July Arrangement Agreement, which was capped at 10 tcfe, representing an increase in total potential consideration to approximately $78.94 per InterOil share from approximately $71.87 per share."

39.     On December 21, 2016, Antelope-7 reached its deepest point – 2,127 meters – without intersecting the Antelope reservoir.  Antelope-7 encountered drilling difficulties the following day, and, as a result, the well operators decided to drill a side track well.

40.     On or around January 13, 2017, Defendants disseminated the false and misleading Information Circular to InterOil shareholders.  InterOil filed the Information Circular with the SEC as Exhibit 99.2 to its Form 6-K on January 17, 2017.  By this date, Antelope-7 had drilled 143 meters below the base carbonate case but failed to intersect the Antelope Field, and so could provide no support for extending the projected western boundary of the Antelope Field beyond its assumed location before drilling Antelope-7.  Thus, Defendants knew or should have known on this date that (i) Antelope-7 had not substantively addressed the volume uncertainty or established the limits of the

Antelope reservoir and so would almost certainly have no material upside impact or a negative impact on the overall projected size of the Antelope Field, the eventual PRL 15 2C Resource Estimate or, most importantly, the CRP, and (ii) consequently, the new CRP cap of 11 tcfe would almost certainly provide no additional consideration for InterOil shareholders above the original CRP cap of 10 tcfe.

41.     Just like Antelope-7, the side track well experienced a series of misses of its key geological targets in January and February 2017.  On January 31, 2017, TOTAL announced the side track well reached 1,980 meters without intersecting the Antelope reservoir.  Then, on February 19, 2017, InterOil announced that the side track well reached its target depth of 2,383 meters without intersecting the Antelope reservoir.

42.     Meanwhile, on February 14, 2017, InterOil shareholders approved the Revised Plan of Arrangement based on the false and misleading Information Circular.  The Supreme Court of Yukon approved the Acquisition pursuant to the Revised Plan of Arrangement on February 20, 2017. Due to the InterOil shareholders' approval, the Acquisition closed on February 22, 2017, with InterOil shareholders purchasing $45.00 worth of Exxon shares and the CRP with each outstanding InterOil share on a fully taxable basis.

43.     The Acquisition amounted to a sale of Exxon shares by Defendants to InterOil shareholders by means of a false and misleading prospectus, as these terms are used by §12(a)(2) of the Securities Act.

**Disabling Conflicts of Interest**

44.     The sales process leading to the Acquisition was driven by Defendants and InterOil management, who collectively made tens of millions of dollars as a direct result of the Acquisition. Both the Board and Company management held a significant number of RSUs that immediately vested as a result of the Acquisition.  As of January 10, 2017, the Board members collectively held

171,287 RSUs worth approximately $7.7 million assuming no CRP, and Company management held 107,375 RSUs worth approximately $4.8 million assuming no CRP.  In addition, Company management received change-in-control payments worth more than $34 million as a result of the Acquisition.  Finally, as a result of the Acquisition, several Defendants and Company insiders stood to make over $3 million in profits from the significant number of common stock they purchased in late 2015 and early 2016 after Exxon informed InterOil that it was interested in acquiring InterOil but before this fact was disseminated to the public.  These conflicts strongly incentivized both the Board and Company management to ignore the concerns raised by Mulacek on behalf of InterOil shareholders.

**Material Omissions and Misstatements in the Information Circular**

45.     The Information Circular omits material facts regarding the effects Antelope-7 will have on the CRP, the actual value of the new CRP cap, and the placement of Antelope-7.  In addition, the Information Circular contains material misstatements concerning whether InterOil shareholders were given all material information regarding Antelope-7 in the Information Circular and/or leading up to the February 14, 2017 shareholder vote.  Due to these material omissions and misstatements, InterOil shareholders were unable to cast an informed vote on the Acquisition.

**Material Omission Regarding the Impact Antelope-7 Will Have on the CRP**

46.     The Information Circular approved by Exxon and InterOil omitted the material fact that Antelope-7 would almost certainly have no impact or a negative impact on the Interim Resource Certification and, thus, the size of the CRP. Rather than disclose this fact, the Information Circular misleadingly stated on several occasions that Antelope-7 could have a positive or negative impact on the Interim Resource Certification without indicating which outcome was more likely.  As a result, InterOil shareholders were misleadingly led to believe there was a good chance Antelope-7 would positively impact the size of the CRP and, thus, the merger consideration.

47.     Antelope-7 was almost certain to have no impact or a negative impact on the CRP. Antelope-7 reached its deepest point by December 22, 2016 without intersecting the Antelope reservoir – more than two weeks before Defendants filed and disseminated the Information Circular. Likewise, Antelope-7's side track well reached nearly 2,000 meters by January 31, 2017 (roughly 87% of its target depth) without intersecting the Antelope reservoir – two weeks before InterOil shareholders voted on the Acquisition, and reached its target depth of 2,383 meters without intersecting the Antelope reservoir by February 19, 2017.[1]

48.     The fact that Antelope-7 was virtually certain to have no impact or a negative impact on the CRP was material for InterOil shareholders because they could not accurately value the CRP and, thus, the merger consideration without this information.  As shown above, InterOil management conditioned InterOil shareholders to believe that Antelope-7 would only be drilled if "it would add significant value for InterOil shareholders," and that Antelope-7 "has got multi-TCFE upside, multi-TCFE possibility of an outcome."  Conversely, the Information Circular did not state that Antelope-7 was likely to have a negative impact or no impact on the CRP.  Consequently, a reasonable InterOil shareholder relying on publicly-disclosed information would have concluded Antelope-7 had a good chance to positively impact the CRP and, thus, would have overvalued the CRP.

49.     The fact that Antelope-7 was virtually certain to have no impact or a negative impact on the CRP was also material because InterOil shareholders could not analyze the fairness opinion rendered by BMO (the "BMO Fairness Opinion") or the Board's conclusions and recommendations derived therefrom that the merger consideration was fair without this information.  BMO used two

---

[1]     As will be discussed in more detail below, the Information Circular repeatedly assured InterOil shareholders that they would receive all material facts regarding Antelope-7 that became available prior to the February 14 shareholder vote.  *See, e.g.*, Information Circular at 108 ("***If additional material information regarding the Antelope-7 appraisal well (and related tests) becomes available prior to the Meeting, InterOil will ensure that such information is available to Securityholders***.").

resource certification scenarios in each valuation analysis: an 8.5 tcfe case and a 7.1 tcfe case.  The

Information Circular described these scenarios as "representing [InterOil management's] view of a

reasonable range of outcomes associated with the Interim Resource Certification process."

However, in light of Antelope-7's results, 8.5 tcfe and 7.1 tcfe was not a reasonable range of

outcomes when the Information Circular was filed or when InterOil shareholders voted in favor of

the Acquisition.  Without disclosure of the fact Antelope-7 would almost certainly have no impact or

a negative impact on the CRP, InterOil shareholders could not properly weigh the results from the

8.5 tcfe case – a much less likely outcome in light of Antelope-7's results, or the 7.1 tcfe case.  The

Board, with direction by Exxon, concluded that the merger consideration was fair and unanimously

recommended the Acquisition to InterOil shareholders based, in part, on the misleading BMO

Fairness Opinion.

50.     The omission of this fact renders several statements in the Information Circular

materially misleading.  The Information Circular repeatedly stated that Antelope-7 could have a

positive or negative effect on the CRP without indicating which outcome was more likely.  For

example, on page 108, the Information Circular stated:

> The impact of the Antelope-7 appraisal well on volume assessments will differ
> depending on the assessor and their interpretation of the volume uncertainty on the
> western flank of the Antelope Field, which Antelope-7 is designed to address. ***The
> actual results of the Antelope-7 appraisal well (and related tests) could impact the
> Interim Resource Certification, potentially in a positive or negative manner***.

51.     Likewise, when answering the question "Do the current publicly available resource

certifications take into account the results of the Antelope-7 appraisal well?," ***and immediately after***

***listing Antelope-7's December target misses***, the Information Circular repeated these statements:

> The impact of the Antelope-7 appraisal well (and related tests) on volume
> assessments will differ depending on the assessor and their interpretation of the
> volume uncertainty on the western flank of the Antelope Field, which Antelope-7 is
> designed to address. ***The actual results of the Antelope-7 appraisal well (and
> related tests) could impact the Interim Resource Certification, potentially in a***

*positive or negative manner. If material information becomes available prior to the Meeting, InterOil will make that information available to Securityholders*.

52.     These statements are misleading because they led InterOil shareholders to believe there was an equal chance, and perhaps better than equal chance, that Antelope-7 would positively impact the CRP.  This is particularly true in light of InterOil's previous statements that it would not drill Antelope-7 unless it was beneficial for InterOil shareholders.

53.     This omission also renders the BMO Fairness Opinion and the conclusions derived therefrom materially misleading.  As detailed above, BMO utilized a resource certification range of 7.1 tcfe to 8.5 tcfe to generate its valuation analyses, which the Information Circular defined as "a reasonable range of outcomes."   However, this range was not reasonable when the Information Circular was filed or when the InterOil shareholder vote occurred, rendering the valuation analyses in the BMO Fairness Opinion materially misleading.  The following conclusions in the Information Circular were also materially misleading as each was based, at least in part, on the misleading BMO Fairness Opinion: (1) BMO's conclusion that the merger consideration was fair, (2) the Board's conclusion that the Acquisition was in the best interest of InterOil shareholders, (3) the Board's conclusion that the merger consideration was fair, (4) and the Board's recommendation to InterOil shareholders to vote in favor of the Acquisition.

54.     Notably, omitting the fact Antelope-7 was virtually certain to have no impact or a negative impact on the CRP very likely caused the Acquisition to be structured as a taxable transaction instead of a tax-free exchange, further damaging InterOil shareholders.  To qualify as a tax-free exchange, the fair market value of the non-stock component of the merger consideration, the CRP, could not represent more than 20% of the total merger consideration.  Had Defendants disclosed that Antelope-7 was almost certain to have no impact or a negative impact on the CRP, the fair market value of the non-stock component of the merger consideration (the CRP) would likely have been small enough to allow the Acquisition to be structured as a tax-free exchange.  Instead, at

a significant cost to InterOil shareholders, the Acquisition was structured as a taxable transaction to avoid having to disclose material facts about Antelope-7 and the true value of the CRP.

**Material Omission Regarding the Increase in the CRP Cap**

55.     The Information Circular omitted the material fact that the increase in the CRP cap from 10 tcfe to 11 tcfe was virtually certain to provide no additional consideration to InterOil shareholders given the results of Antelope-7.  Rather than disclose this fact, the Information Circular misleadingly presented the increase in the CRP cap as potentially worth an additional $670 million (or $7.07 per share) in merger consideration without explaining the likelihood that the increase of the CRP cap would be triggered.

56.     The Updated GLJ Certification – the most recent 2C estimate performed prior to the Acquisition – provided a 2C estimate for the Antelope Field of 7.80 tcfe.  The Updated GLJ Certification incorporated data from all appraisal wells other than Antelope-7.  Assuming the relative accuracy of GLJ's resource certification, Antelope-7 would have had to increase the 2C resource estimate by at least 2.20 tcfe for the increase in the CRP cap to provide any value to InterOil shareholders.  However, as explained in detail above, Antelope-7 was virtually certain to have no impact or a negative impact on any subsequent 2C resource estimate.  Defendants knew the increase in the CRP cap was virtually certain to provide no additional value for InterOil shareholders prior to filing the Information Circular, indicating Defendants included it to mislead InterOil shareholders into approving the Acquisition.

57.     The omission of the fact that the increase in the CRP cap was virtually certain to provide no additional consideration to InterOil shareholders is material because it prevented InterOil shareholders from accurately valuing the CRP and, thus, the merger consideration.  Had Defendants disclosed that the increase in the CRP cap was an illusory benefit and almost certainly valueless, InterOil shareholders would likely have placed a much smaller and more accurate value on the CRP.

58.     The omission of this fact renders the several statements that describe the potential positive impact of the increase in the CRP cap materially misleading.  For example, when answering the question "What's the difference between the Original Arrangement and the Arrangement I'm being asked to vote on?," the Information Circular stated:

> The base consideration of shares of ExxonMobil Shares worth $45.00 offered under the Original Arrangement has not changed.  The contingent resource payment of approximately $7.07 for each incremental tcfe of PRL 15 2C Resources that is above 6.2 tcfe (along with the post-closing escrow arrangement) has also not changed, except that the 10 tcfe cap on the CRP has been raised to 11 tcfe. ***The increase in the cap on the CRP represents an increase of the maximum potential CRP Payout from $1.37 billion to $1.73 billion***.  The potential impact of the increase in the cap on the CRP, and certain other changes that were made to the Arrangement Agreement, are described in this Information Circular.

59.     Likewise, the omission renders the several tables that illustrate the potential positive impact of the increase in the CRP cap materially misleading.  For example, the Information Circular contains the following misleading table, which illustrates the potential impact of the increase in the CRP but does not explain that the increase is almost certain not to be implicated:

### Table 3 – Indicative Payments

| | Interim Resource Certifications | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 5.0 tcfe | 6.0 tcfe | 7.0 tcfe | 8.0 tcfe | 9.0 tcfe | 10.0 tcfe | 11.0 tcfe | 12.0 tcfe |
| **Payments from Total S.A.** | | | | | | | | |
| Net Interim Resource Certification Payment (in $ millions) payable by Total S.A. | $0.00 | $178.64 | $539.79 | $941.06 | $1,342.34 | $1,743.61 | $2,144.89 | $2,546.16 |
| **CRP Payout** | | | | | | | | |
| Base Consideration of $45 plus Total CRP Payout (in $ millions) | $2,298.72 | $2,298.72 | $2,587.64 | $2,948.79 | $3,309.94 | $3,671.09 | $4,032.23 | $4,032.23 |
| Total CRP Payout (in $ millions) | $0.00 | $0.00 | $288.92 | $650.07 | $1,011.21 | $1,372.36 | $1,733.51 | $1,733.51 |
| CRP Payout per Common Share | $0.00 | $0.00 | $5.66 | $12.73 | $19.80 | $26.87 | $33.94 | $33.94 |

60.     The statements and tables referenced above were particularly misleading in light of InterOil's previous statements regarding Antelope-7, mainly that Antelope-7 would only be drilled if

it would significantly benefit InterOil shareholders and that Antelope-7 had 3 tcfe upside.  A reasonable InterOil shareholder relying on publicly-available information would apply Antelope-7's purported 3 tcfe upside to the Updated GLJ Certification 2C estimate of 7.80 tcfe (for a sum of 10.80 tcfe) and logically, yet incorrectly, conclude that the increase in the CRP cap from 10 tcfe to 11 tcfe had a good chance of adding hundreds of millions of dollars of merger consideration.

**Material Omission Regarding the Placement of Antelope-7**

61.     The Information Circular omitted the fact that Antelope-7 was not placed in the most suitable location to address the volume uncertainties or to establish the limits of the Antelope reservoir.  Instead, the Information Circular strongly implied that Antelope-7 was in fact placed in the most suitable location to achieve its objectives.

62.     Antelope-7 was not placed in the proper location to address the volume uncertainties or to establish the limits of the Antelope reservoir.  Again, Antelope-7 reached its maximum depth without intersecting the Antelope reservoir weeks before the Information Circular was filed, and its side track well reached a depth of more than 2,000 meters without intersecting the Antelope reservoir prior to the InterOil shareholder vote.  Thus, the only information Antelope-7 and its side track well provided was that the Antelope reservoir does not extend as far west as Antelope-7.  This information alone does not substantively address either the volume uncertainties or the limits of the Antelope reservoir.

63.     This omission is material to InterOil shareholders because Antelope-7's placement and ability to address the volume uncertainties and limits of the Antelope Field directly impacted the value of the CRP.  By failing to disclose the fact Antelope-7 was misplaced and unable to substantively achieve its objectives, Defendants prevented InterOil shareholders from accurately valuing the CRP, and, thus, casting an informed vote on the Acquisition.  Moreover, this omission is material because misplacement of Antelope-7 (*e.g.* placing Antelope-7 too far west to address the

volume uncertainties of the western flank) could artificially suppress the PRL 15 2C Resource Estimates, potentially costing InterOil shareholders hundreds of millions to billions of dollars in additional merger consideration.

64.     This omission rendered several statements in the Information Circular materially misleading, as these statements led InterOil shareholders to believe Antelope-7 was placed in the proper location to address its stated objectives when in fact it was not.  For example, when answering the question: "Is Antelope 7 being drilled in the appropriate location?," the Information Circular explained that the PRL Joint Venture partners and their respective technical teams agreed that Antelope-7 was being drilled in "the most suitable location to address the volume uncertainties on the western flank of the Antelope Field."  Specifically, the Information Circular answered the question as follows:

> *Appraisal drilling is designed to establish the limits of the [Antelope] reservoir, the productivity of the wells and characteristics of oil or gas*.  Total S.A., as the operator of the PRL 15 Joint Venture, proposed the location for the Antelope-7 appraisal well.  This proposal was reviewed by each of the PRL Joint Venture partners and their respective technical teams, after taking into account previous drilling tests, and was agreed upon to be the most suitable location to address the volume uncertainties on the western flank of the Antelope Field.

65.     Likewise, the Information Circular repeatedly states that Antelope-7 is designed to provide structural control and reservoir definition for the Antelope Field, and does not state that Antelope-7 would not, or was unlikely to, achieve these objectives.  For example, the Information Circular stated on page 108:

> The Antelope-7 well, which commenced drilling in November 2016, is the final appraisal well in the Appraisal Work Program. *The Antelope-7 appraisal well is designed to provide structural control and reservoir definition to the Elk-Antelope Fields' western flank*.

**Material Misstatements Regarding Whether InterOil Shareholders Received All Material Information Regarding Antelope-7 Prior to the Shareholder Vote**

66.     The Information Circular contained material misstatements regarding whether InterOil shareholders would receive all material information regarding Antelope-7 prior to the February 14 shareholder vote. In truth, as the preceding sections make clear, Defendants failed to disclose a number of material facts regarding Antelope-7 prior to the InterOil shareholder vote.

67.     The Information Circular repeatedly assured InterOil shareholders that they would receive all material information regarding Antelope-7 prior to the February 14 shareholder vote. For example, on page 113, the Information Circular states:

> As described above, the drilling of the Antelope-7 appraisal well is ongoing. *If additional material information regarding the Antelope-7 appraisal well (and related tests) becomes available prior to the Meeting, InterOil will ensure that such information is available to Securityholders*. The impact of the Antelope-7 appraisal well on volume assessments will differ depending on the assessor and their interpretation of the volume uncertainty on the western flank of the Antelope Field, which Antelope-7 is designed to address. The actual results of the Antelope-7 appraisal well (and related tests) could impact the Interim Resource Certification, potentially in a positive or negative manner.

68.     Again, on page 33, the Information Circular states:

> **Antelope-7 Drilling**. Under the Arrangement Agreement, InterOil is able to provide Securityholders with material information regarding the Antelope-7 appraisal well, which commenced drilling on November 2, 2016. As a result, *Shareholders will have the most up-to-date information available regarding the Antelope-7 appraisal well at the time of the Meeting*.

69.     These assurances were misstatements because Defendants did not disclose several pieces of material information regarding Antelope-7 to InterOil shareholders prior to the February 14 shareholder vote.  Specifically, Defendants failed to disclose the following material facts regarding Antelope-7 to InterOil shareholders prior to the shareholder vote: (i) Antelope-7 will almost certainly have no effect or a negative effect on the CRP; (ii) Antelope-7's results virtually ensure that the new CRP cap will provide no additional consideration to InterOil shareholders; and (iii) Antelope-7 was not placed in the "most suitable location" to address the volume uncertainties and establish the limits

of the Antelope reservoir.  Defendants knew that the Information Circular both assured InterOil shareholders that they would receive material information regarding Antelope-7 and omitted the material facts regarding Antelope-7 listed above.

70.    These misstatements were material to InterOil shareholders because Antelope-7 directly and significantly impacted the CRP, making it vitally important for Defendants to disclose all material information regarding Antelope-7 to InterOil shareholders.  By failing to comply with their repeated assurances to provide material information regarding Antelope-7 to InterOil shareholders, Defendants prevented InterOil shareholders from accurately valuing the CRP and, thus, casting an informed vote on the Acquisition.

**Exxon Was Responsible for the Material Misstatements in the Information Circular**

71.    Exxon, like InterOil and the Individual Defendants, was responsible for the material misstatements in the Information Circular identified above.  As stated in §2.5 of the Amended Arrangement Agreement:

> (d) Parent [Exxon] shall provide, on a timely basis, the Company [InterOil] with all information regarding Parent, its affiliates and the Parent Shares, as required by the Interim Order or applicable Laws for inclusion in the Company Circular or in any amendments or supplements to such Company Circular.  Parent and the Company shall also use their commercially reasonable efforts to obtain any necessary consents from any of their respective auditors and any other advisors to the use of any financial, technical or other expert information required to be included in the Company Circular and to the identification in the Company Circular of each such advisor.  Parent shall take all reasonable steps to ensure that such information does not include any misrepresentation concerning Parent and its affiliates, including in relation to the Parent Shares.
>
> (e) The Company and Parent each acknowledge the importance of consistency across all public documents and, in that context, Parent and its legal counsel shall be given a reasonable opportunity to review and comment on the Company Circular (and any amendment to the Company Circular) prior to the Company Circular being printed and/or filed with any Governmental Entity, and reasonable consideration shall be given to any comments made by Parent and its legal counsel.  The Company shall provide Parent with final copies of the Company Circular prior to the mailing to the Company Securityholders.

(f) The Company and Parent shall each promptly notify the other if at any time before the Effective Date either becomes aware that the Company Circular contains a misrepresentation, or otherwise requires an amendment or supplement and the Parties shall co-operate in the preparation of any amendment or supplement to the Company Circular as required or appropriate, and the Company shall promptly mail or otherwise publicly disseminate any amendment or supplement to the Company Circular to Company Securityholders and, if required by the Court or applicable Laws, file the same with any Governmental Entity and as otherwise required.

(g) The Company shall mail or publicly disseminate an amendment or supplement to the Company Circular in connection with any new or updated information which, in the reasonable judgment of the Company Board or the Transaction Committee, should be made available to the Company Securityholders prior to the date of the Company Meeting.  Prior to any dissemination of any such amendment or supplement to the Company Circular, Parent and its legal counsel shall be given a reasonable opportunity to review and comment thereon and reasonable consideration shall be given by the Company to any comments made by Parent and its legal counsel.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased the common stock of Exxon and the CRP pursuant to the Information Circular and in connection with the Acquisition on or about February 22, 2017 (the "Class").  Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff at this time but the names and addresses of the Class members can be ascertained from the books and records of InterOil.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

74.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

75.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Information Circular issued by InterOil and Exxon to InterOil shareholders in connection with the Acquisition negligently omitted and/or misrepresented material facts about the Company and its business;

(c)     whether the consideration received by class members in connection with the Acquisition was artificially deflated by the false and misleading statements; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

## COUNT

### Violations of §12(a)(2) of the Securities Act
### Against All Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against all Defendants.

80.     Defendants were sellers and offerors and/or solicitors of purchasers of the Exxon common stock and the CRP offered pursuant to the Information Circular.

81.     The Information Circular contained untrue statements of material facts, omitted to state other facts necessary to make certain statements not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included participating in the preparation of the false and misleading statements in the Information Circular.

82.     Defendants owed to the purchasers of Exxon common stock, including Plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Information Circular to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the Information Circular as set forth above.

83.     Plaintiff and other members of the Class purchased or otherwise acquired Exxon common stock and the CRP pursuant to the defective Information Circular.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the inaccuracies and omissions contained in the Information Circular.

84.     By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and members of the Class sustained substantial damages in connection with their purchase of Exxon stock and the CRP.  Accordingly, Plaintiff and the other members of the Class were harmed, and seek damages in connection with which they hereby tender their Exxon shares and the CRP purchased in the Acquisition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorney's fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  January 2, 2018               KENDALL LAW GROUP, LLP
                                       JOE KENDALL

                                       *Joe Kendall*
                                       _____
                                       Joe Kendall
                                       Texas Bar No. 11260700
                                       jkendall@kendalllawgroup.com
                                       Jamie J. McKey
                                       Texas Bar No. 24045262
                                       jmckey@kendalllawgroup.com
                                       3232 McKinney, Suite 700
                                       Dallas, Texas 75204
                                       Telephone: 214/744-3000
                                       214/744-3015 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID T. WISSBROECKER
TIMOTHY Z. LACOMB
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)

Attorneys for Plaintiff