# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIM C. BLOCK, individually and on behalf of others similarly situated,<br>Plaintiff,<br>v.<br>INTEROIL CORPORATION, et al.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 3:18-CV-7-S |

## MEMORANDUM OPINION AND ORDER

Lead Plaintiff Melanie A. Cissone ("Plaintiff") brings this federal securities class action individually and on behalf of former shareholders of InterOil stock against Defendants for violations of § 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(a)(2). Plaintiff challenges disclosures made by Defendant InterOil Corporation ("InterOil") in an Information Circular distributed to InterOil shareholders. The Information Circular was issued to solicit InterOil shareholders' votes in favor of a proposed acquisition of InterOil by Defendant Exxon Mobil Corporation ("Exxon" and collectively with InterOil, the "Corporate Defendants"). After a competitive auction process involving bids from multiple parties, the Corporate Defendants entered into an amended and restated acquisition agreement (the "Arrangement Agreement"), pursuant to which Exxon would acquire InterOil (the "Arrangement").[1] InterOil shareholders overwhelmingly voted in favor of the Arrangement Agreement, and the Supreme Court of Yukon approved the Arrangement as fair and reasonable. Plaintiff, however, alleges that the Information Circular contained numerous false statements and omissions that prevented InterOil shareholders from casting an informed vote. As a result, Plaintiff avers that InterOil shareholders suffered

---

[1] The Court will use the terms of art under the Yukon Business Corporation Act and the defined terms as set forth in the Information Circular. *See* Defs.' App. 180-95, 197-99.

1

substantial harm because the consideration they received from the Arrangement grossly undervalued their InterOil shares.

At issue in this case is whether Plaintiff can now turn to this Court for relief after failing to exercise her right to appear before the Canadian court to challenge the Arrangement and the disclosures in the Information Circular. Defendants argue that Plaintiff's claims should not be relitigated, and that the Court should exercise its discretion and dismiss her claims on international comity grounds. For the reasons that follow, the Court agrees that comity requires deference to the prior Canadian court proceeding, and therefore grants the Corporate Defendants' Motion to Dismiss [ECF No. 35] and dismisses Plaintiff's Amended Complaint in its entirety.

## I. BACKGROUND

Per Special Order 3-319, this case was transferred from the docket of Judge Ed Kinkeade to the docket of this Court on March 12, 2018. The parties through their counsel appeared before the Court for oral argument on the pending motions on January 15, 2019.

### *A. InterOil*

Prior to its acquisition by Exxon, InterOil was a publicly-traded oil and gas company listed on the New York Stock Exchange ("NYSE") engaged in the exploration, appraisal, and development of hydrocarbon resources. Am. Compl. ¶ 7. InterOil was incorporated in Yukon Territory, Canada, and headquartered in Singapore, with additional offices in Port Moresby, Papua New Guinea ("PNG"). *Id.* At the time of the Arrangement, InterOil's two primary assets were: (1) a 36.5 percent interest in petroleum retention license 15 ("PRL 15") in the Gulf Province of PNG, and (2) a right to receive future payments from French oil and gas supermajor TOTAL, S.A. ("Total"), arising from Total's 2014 purchase from InterOil of a 40.19 percent license interest in the PRL 15 (the "Total Payments"). *Id.* ¶¶ 22, 44. PRL 15 covers an area of 763 square kilometers.

*Id.* ¶ 22. The Elk-Antelope Fields are located within PRL 15. *Id.* Total assumed operations of PRL 15 on August 1, 2015. *Id.* at n.1. The value of both assets is directly tied to the amount of resources in the Elk-Antelope Fields and/or estimates of such resources. *Id.* ¶ 44. InterOil did not expect commercialization of the PRL 15 fields until approximately 2023. Defs.' App. 174-75.

Under the Total Payments, InterOil shareholders would potentially receive three contingent payments based primarily on certified resource estimates for the Elk-Antelope Fields. Am. Compl. ¶ 45. The first payment would be based on the Interim Resource Certification, which was a process to certify the size of the resources in the Elk-Antelope Fields carried out by two independent resource certifiers. *Id.* InterOil engaged GLJ Petroleum Consultants, Ltd. ("GLJ"), an independent, third-party evaluator, to prepare annual contingent resource estimates for the Elk-Antelope Fields since at least 2009. *Id.* ¶ 54; *see also* Defs.' App. 173, 307. The second and third payments would be based on resource certifications that relied on actual resources recovered from the Elk-Antelope Fields. Am. Compl. ¶ 46.

### *B. Acquisition by Exxon*

In 2015, the InterOil board of directors (the "Board") decided to explore the sale of minority interests in some of InterOil's assets. *Id.* ¶ 26. In late 2015, the Board approached a select group of four oil and gas companies about a possible transaction: Exxon, Oil Search Limited ("Oil Search"), "Party B" (as referred to in the Information Circular), and a party that declined to participate. *Id.* On March 1, 2016, InterOil signed a confidentiality agreement with Exxon concerning a possible whole-company acquisition. *Id.* ¶ 28. On March 11 and March 14, 2016, respectively, both Party B and Oil Search submitted non-binding indicative proposals to acquire all of the issued and outstanding shares of InterOil. *Id.* ¶ 29. With three proposals on the table,

the Board authorized management and InterOil's advisors to continue discussions with Exxon, Party B, and Oil Search, and appointed the Transaction Committee. *Id.*

Ultimately, Party B decided not to revise its offer, but both Oil Search and Exxon submitted revised, non-binding proposals. *Id.* ¶ 30. On May 20, 2016, InterOil announced that it had entered into an agreement with Oil Search for Oil Search to acquire all of the issued and outstanding shares of InterOil. *Id.* On June 23, 2016, InterOil received an unsolicited, non-binding proposal from Exxon to acquire InterOil. *Id.* ¶ 31. In light of the topping bid from Exxon and Oil Search's failure to revise its offer, InterOil terminated the Oil Search transaction, paid a $60 million termination fee to Oil Search, and entered into an acquisition agreement with Exxon (the "Original Arrangement Agreement"). *Id.*

Under the terms of the Original Arrangement Agreement, Exxon would acquire all issued and outstanding common shares of InterOil for (i) $45.00 per InterOil share payable in Exxon shares, and (ii) a contingent resource payment ("CRP") for $7.07 per InterOil share for each trillion cubic feet equivalent ("tcfe") of PRL 2C Resources above 6.2 tcfe, up to a maximum of 10 tcfe.[2] *Id.* ¶ 32. No additional payment would be made for PRL 2C Resources in excess of 10 tcfe. *Id.* The Original Arrangement Agreement provided that the InterOil shares would be acquired pursuant to a statutory plan of arrangement under Yukon Law (the "Original Arrangement"). *Id.* ¶ 33. For closing to occur, the Supreme Court of Yukon was required to find that the Original Arrangement was "fair and reasonable." *Id.*

On July 21, 2016, InterOil's financial advisor provided its opinion to the Board that the consideration offered was fair from a financial standpoint. *Id.* ¶ 34. That same day, the Board approved the Original Arrangement, and InterOil and Exxon entered into the Original

---

[2] "2C" is considered to be the best estimate of the quantity that will actually be recovered. Am. Compl. ¶ 32 n.2. It is equally likely that the actual remaining quantities recovered will be greater or less than the best estimate. *Id.*

4

Arrangement Agreement. *Id.* The Board issued an information circular to InterOil shareholders, and recommended that shareholders approve the Original Arrangement. See Defs.' App. 366. On September 21, 2016, InterOil shareholders voted in favor of the of the Original Arrangement Agreement. Am. Compl. ¶ 36.

At the fairness hearing before the Supreme Court of Yukon on September 27, 2016, Phil Mulacek, founder and former Chairman of InterOil, challenged the fairness and reasonableness of the Original Arrangement. *Id.* The Supreme Court of Yukon approved the Original Arrangement as fair and reasonable. *Id.*; *see also* Defs.' App. 374. Mulacek appealed. Am. Compl. ¶ 36. On November 4, 2016, the Court of Appeal of Yukon overturned the Supreme Court of Yukon's decision that the Original Arrangement was "fair and reasonable." *Id.* ¶ 37. Among the red flags noted by the Court of Appeal of Yukon was the absence of a fairness opinion from an independent expert and the failure of InterOil's financial advisor to assess the value of the CRP as compared with the value InterOil shareholders would receive by retaining their shares. *Id.* The Court of Appeal's ruling terminated the Original Arrangement and required Exxon and InterOil to agree on a new plan, subject to approval by both InterOil's shareholders and the Supreme Court of Yukon. *Id.* ¶ 38.

Following the Court of Appeal's decision, the Board reconvened the Transaction Committee. *Id.* ¶ 39. The Transaction Committee retained its own independent counsel and retained BMO Nesbitt Burns Inc. ("BMO") as InterOil's financial advisor. *Id.* The Transaction Committee also requested that GLJ prepare an updated contingent resource report for the Elk-Antelope Fields. *Id.* ¶ 39. On November 30, 2016, GLJ provided the updated report, which indicated that GLJ's estimate of the PRL 15 2C Resources was now only 7.80 tcfe, down 23.5 percent from its previous 2C estimate of 10.18 tcfe as of December 31, 2015. *Id.* ¶ 40. GLJ

attributed its new lower estimate primarily to data collected from the Antelope-6 appraisal well. *Id.* GLJ's 2015 contingent resource report did not include results from Antelope-6. *Id.* ¶ 54 n.7.

Ultimately, in a revised agreement with Exxon, Exxon agreed to pay $45.00 for each InterOil share, payable in Exxon stock, and increased the total potential CRP by raising the cap on the payment from 10 tcfe to 11 tcfe. *Id.* ¶¶ 41, 42. On December 15, 2016, the Board unanimously voted in favor of the Arrangement under the amended statutory plan of arrangement and entered into the Arrangement Agreement. *Id.* ¶ 41. On or around January 13, 2017, InterOil distributed the Information Circular to InterOil shareholders to solicit proxies from its shareholders to vote in favor of the Arrangement. *Id.* ¶ 42. The Information Circular advised InterOil shareholders of their right to oppose the transaction at the fairness hearing, as well as their right to dissent and have the Yukon court determine the fair value of their shares. Defs.' App. 77, 103-05.

On February 14, 2017, InterOil shareholders approved the Arrangement Agreement. Am. Compl. ¶ 42. The Supreme Court of Yukon approved the Arrangement pursuant to the Arrangement Agreement on February 20, 2017. *Id.* The Arrangement closed on February 22, 2017. *Id.* In contrast to the hearing on the Original Arrangement, no InterOil shareholders appeared at the hearing to oppose the transaction in any respect. Defs.' App. 461.

## II. ANALYSIS

Plaintiff alleges that the Information Circular contained false statements concerning material facts, and also omitted material information, rendering several statements in the Information Circular materially misleading. Am. Compl. ¶ 76. According to Plaintiff, "Without full and accurate disclosure of this material information, InterOil shareholders could not properly analyze the adequacy of the consideration or cast an informed vote on the Acquisition." *Id.* Plaintiff asserts one count for violations of § 12(a)(2) of the Securities Act against all Defendants.

*Id.* ¶ 108. Section 12(a)(2) provides remedies to stockholders who were offered or sold a security in a public offering by means of a prospectus that contained factual misstatements or omissions relating to the security being sold. *See* 15 U.S.C. § 77l(a)(2); *see also Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001).

The Corporate Defendants move to dismiss on three grounds, arguing that: (1) international comity requires dismissal of the Amended Complaint; (2) Plaintiff fails to state a cognizable § 12(a)(2) claim; and (3) Plaintiff fails to allege any material misstatements or omissions, and therefore dismissal is proper under Rule 12(b)(6).

Defendants Michael Hession, Christopher Finlayson, Chee Keong Yap, Dr. Ellis Armstrong, Ford Grant Nicholson, Isikeli Reuben Taureka, Sir Wilson Kamit, and Sir Rabbie L. Namaliu (collectively, the "Director Defendants"), former members of the Board, also filed a Motion to Dismiss [ECF No. 36]. The Director Defendants join each of the Corporate Defendants' grounds for dismissal, and also move to dismiss on two additional grounds, contending that: (1) Plaintiff fails to allege any facts that provide the Court a basis to assert personal jurisdiction over the non-U.S.-domiciled Director Defendants; and (2) the Director Defendants cannot be liable under § 12(a)(2) because they did not offer or sell Exxon stock.

### *A. International Comity*

Defendants move to dismiss on the basis of international comity, arguing that the "Court should exercise its discretion, defer as a matter of international comity to the Canadian court that already fully evaluated the transaction and its related disclosures, and dismiss the Complaint." Corporate Defs.' Mot. 11.

International comity "is the recognition which one nation allows within its territory to the . . . judicial acts of another nation, having due regard both to international duty and convenience,

and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). "Although comity is not an 'absolute obligation,' it is more than 'mere courtesy and good will.'" *Derr v. Swarek*, 766 F.3d 430, 438 (5th Cir. 2014) (quoting *Hilton*, 159 U.S. at 163-64). "If an otherwise valid judgment is rendered in a foreign court, the merits of the case will not be re-litigated if 'there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect.'" *Id.* (quoting *Hilton*, 159 U.S. at 202-03.). Comity is an affirmative defense, and the parties urging comity have the burden of proof on the issue. *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003) (citing *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993)).

Deference to a foreign court under principles of comity is appropriate where: (1) the foreign judgment was rendered by a court of competent jurisdiction, which had jurisdiction over the cause and the parties, (2) the judgment is supported by due allegations and proof, (3) the relevant parties had an opportunity to be heard, (4) the foreign court follows procedural rules, and (5) the foreign proceedings are stated in a clear and formal record. *Id.* (citing *Hilton*, 159 U.S. at 159); *see also Derr*, 766 F.3d at 437.

Dismissal on the basis of comity is appropriate in this case. As to the first and fourth elements, "Canada is a sister common-law jurisdiction," and "American courts have consistently deferred to Canadian courts under the comity principle." *Caddel v. Clairton Corp.*, 105 B.R. 366, 366 (N.D. Tex. 1989). "[T]he Court is aware of no case in which an American court has refused to defer to Canada." *Id.* (quoting *Fleeger v. Clarkson Co., Ltd.*, 86 F.R.D. 388, 393 (N.D. Tex.

1980)). Plaintiff does not dispute that the Supreme Court of Yukon is a court of competent jurisdiction and that all procedural rules were followed. *See* Pl.'s Resp. 27-31.

As to the second element and third element, Plaintiff and all other InterOil shareholders had a full and fair opportunity to appear before the Yukon courts to object to the Arrangement and challenge the adequacy of the Information Disclosure. *See* Am. Compl. ¶¶ 36-38, 42; *see also* Defs.' App. 363-408, 409-47, 458-75 (judgments from Yukon courts). The Supreme Court of Yukon approved the Arrangement pursuant to the Arrangement Agreement on February 20, 2017, at a final hearing. Am. Compl. ¶ 42; *see also* Defs.' App. 458-75. On January 13, 2017, InterOil issued a Notice of Meeting and Management Information Circular regarding the Arrangement to its shareholders. *See* Defs.' App. 6-333. In the notice, InterOil advised shareholders of their rights to attend the hearing to oppose the Arrangement and make submissions to the court. *See id.* at 77. Plaintiff did not avail herself of that opportunity. *See* Corporate Defs.' Mot. 13; *see also* Defs.' App. 461.

At the final fairness hearing, InterOil made submissions to support its position that the Arrangement was fair and reasonable. *See* Defs.' App. 460. In reaching its conclusion, the Supreme Court of Yukon considered these submissions, which included, *inter alia*: (a) a long-form fairness opinion from BMO that stated the consideration to be received pursuant to the Arrangement is fair from a financial point of view to the shareholders; (b) the Transaction Committee and the Board unanimously recommended the Arrangement Agreement; (c) the Information Circular fully disclosed the nature and details of the Arrangement; (d) at the meeting, 91.24 percent of InterOil shareholders voted in favor of the Arrangement Agreement; and (e) two leading proxy firms recommended that the shareholders vote in favor of the Arrangement. *Id.*

As to the last element, the Supreme Court of Yukon issued a final written judgment on March 1, 2017. *See id.* at 459-63. The Canadian court held, "I have approved the plan of arrangement as being procedurally and substantively fair to Inter[O]il and its shareholders[.]" *Id.* at 459. The Court concluded that "Inter[O]il provided the shareholders with considerable information on the value of the new Arrangement and the value of the contingent resources." *Id.* at 462.

"The principle of comity directs deference to a foreign court of competent jurisdiction (in this case, Canada), so long as the laws and public policy of the forum state (Texas) and the rights of the forum's residents are not violated." *Fleeger*, 86 F.R.D. at 392. Plaintiff challenges dismissal on the basis of international comity on several grounds. First, Plaintiff asserts that deference to the Canadian courts is not appropriate because the period within which she would have had to make her submission to the Canadian court was shorter than the applicable statute of limitations for § 12(a)(2) claims. Pl.'s Resp. 30. The Court finds this argument unavailing. Plaintiff does not argue that she could not have challenged the disclosures as part of the Canadian court proceedings. In fact, Plaintiff concedes that her disclosure claims are based on information that was publicly available prior to that proceeding. *See id.* at 29. The necessary information relating to Plaintiff's disclosure claim in this action existed at the time the Supreme Court of Yukon held the final fairness hearing, and any InterOil shareholder could have appeared at the hearing to raise challenges to the Arrangement and Information Circular. Plaintiff's failure to appear in the Canadian court does not validate her decision to file a lawsuit ten months later in this Court. "Plaintiff voluntarily purchased shares in a Canadian corporation which put [her] on notice that

[her] rights as a shareholder would be construed according to Canadian law." *Fleeger*, 86 F.R.D. at 393.[3]

Second, Plaintiff makes a statutory and policy-based argument that Congress did not intend for fairness determinations made by foreign courts to "preempt" § 12(a)(2) claims or prevent access to U.S. courts. *See* Pl.'s Resp. 28, 30. But the question is whether this Court should exercise its discretion and defer to the Canadian proceedings, not whether those proceedings preclude or preempt plaintiff's claim. Given the prior ruling from the Supreme Court of Yukon and the ongoing dissenters' rights proceeding, it is appropriate for this Court to exercise its discretion and defer to the Canadian court as a matter of international comity.

Finally, Plaintiff also makes an argument against international comity relying on issue preclusion and a Second Circuit case, *Dougherty v. Carver Fed. Savings Bank*, 112 F.3d 613 (2d Cir. 1997). *See* Pl.'s Resp. 29-30. In *Dougherty*, the Second Circuit held that agency approval of a bank conversion does not preclude a federal district court from adjudicating securities fraud claims premised on alleged misstatements and omissions in the bank's offering circular distributed in connection with the conversion. 112 F.3d at 614-15. The Second Circuit noted that "[c]ourts are generally reluctant to give preclusive weight to factual determinations made by administrative agencies" because the agency's approval of the transaction was "made in a non-judicial capacity— the regulations made no provision for an evidentiary hearing or any other opportunity to present witnesses." *Id.* at 616-17, 623. The Court finds Plaintiff's collateral estoppel argument and reliance on *Dougherty* unpersuasive. First, Defendants are not making the argument that InterOil

---

[3] The Court notes that in addition to her right to challenge the Arrangement and raise disclosure claims at the fairness hearing, Plaintiff also had the opportunity to dissent from the transaction and seek a judicial determination of the fair value of her InterOil stock by the Canadian court. *See* Defs.' App. 77, 103-05. There is currently an ongoing proceeding in Canada brought by InterOil shareholders who are seeking a statutory determination of the fair value of their shares. *See Carlock v. ExxonMobil Canada Holdings ULC*, 2019 YKSC 10 (Can.); *see also* Defs.' Notice of Development Regarding Canadian Dissent Proceeding [ECF No. 52]. Plaintiff opted not to seek such relief in Canada. *See id.*

11

shareholders are collaterally estopped from pursuing this lawsuit. Collateral estoppel, or issue preclusion, and international comity are two distinct legal principles. *Compare Hilton*, 159 U.S. at 163-64 ("[Comity] is the recognition which one nation allows within its territory to the . . . judicial acts of another nation . . . .") *with New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001) ("Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim."); *see also A.P. Moller-Maersk A/S v. Ocean Express Miami*, 550 F. Supp. 2d 454, 470 (S.D.N.Y. 2008) ("[T]he United States' recognition of a foreign decision 'is permissive, unlike the mandatory doctrines of res judicata, collateral estoppel, and full faith and credit, and rests on notions of comity[.]" (quoting *S. Ionian Shipping Co., Ltd. v. Hugo Neu & Sons Int'l Sales Corp.*, 535 F. Supp. 323, 325 (S.D.N.Y. 1982))); *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1044 (5th Cir. 2012) ("[Comity] is not a rule of law, but one of practice, convenience, and expediency."). Second, *Dougherty* is distinguishable to the case at hand. Unlike approval from an agency, the Canadian proceeding was adversarial and provided InterOil shareholders with an opportunity to challenge the Arrangement and the Information Circular. Plaintiff has offered no support for her position that the Canadian court proceedings were "akin to a federal agency approving a transaction in the U.S." Pl.'s Resp. 5. Moreover, *Dougherty* does not address international comity. The Court finds that Plaintiff's collateral estoppel argument is irrelevant to the analysis.

A similar case from the Southern District of New York, *DeYoung v. Beddome*, 707 F. Supp. 132 (S.D.N.Y. 1989), is helpful to the Court's analysis. In *DeYoung*, the plaintiff was a stockholder in Dome Petroleum Limited ("Dome"), a Canadian oil and gas company. *Id.* at 133. Amoco Canada Petroleum Company, the Canadian subsidiary of Amoco Corporation, a global

12

chemical and oil company, proposed to buy Dome. *Id.* Under the Canada Business Corporation Act, the proposed acquisition had to be approved by Dome's creditors and stockholders, and by the Canadian court. *Id.* at 134. The Court of Queen's Bench of Alberta approved the transaction, finding that it was "fair and reasonable to the shareholders of Dome," and also that the proxy materials provided to the Dome shareholders constituted "full, true and plain disclosure of all material facts surrounding the Plan of Arrangement." *Id.* at 135.

The plaintiff in *DeYoung* filed an action in the Southern District of New York, alleging a violation of § 14(a) of the Securities Act. The plaintiff claimed the proxy statement was materially misleading in its reference to the proposed Dome acquisition. *Id.* The district court, however, dismissed the § 14(a) claim on international comity grounds, reasoning that the Canadian court had already determined that the transaction was fair and reasonable and that shareholders had received full disclosure of all material facts. *Id.* at 137. The court also found that Canadian law provided broad protection to investors. *Id.* at 136-37.

In the case at hand, the Court finds that the Canadian court proceedings satisfy every element that warrants dismissal on international comity grounds: (1) the Supreme Court of Yukon was a court of competent jurisdiction that had jurisdiction over InterOil and InterOil's shareholders; (2) the court's final judgment was supported by submissions by InterOil; (3) InterOil shareholders had an opportunity to appear and be heard; (4) the court followed established procedural rules; and (5) the court issued a written order resolving the hearing. *See Int'l Transactions*, 347 F.3d at 594 (explaining the elements supporting deference on comity grounds). Moreover, the Court finds that Plaintiff has failed to show prejudice in the Canadian court, or in the system of laws under which it was sitting, fraud in procuring the judgment, or any other special reason why the comity of this Nation should not allow the judgment of the Supreme Court of

Yukon full effect. *See Derr*, 766 F.3d at 438 (quoting *Hilton*, 159 U.S. at 202-03). The same shareholder oppression remedies and rights that the *DeYoung* court found important existed in connection with this transaction. *See* Defs.' App. 149-51. Therefore, the Court finds that Defendants have met their burden in establishing that international comity is appropriate in the instant case. The Court in its discretion will defer to the ruling of the Supreme Court of Yukon and will not re-litigate Plaintiff's claims. Comity compels dismissal; thus, the Court grants the Corporate Defendants' Motion to Dismiss.

### III. CONCLUSION

For the reasons stated above, the Court defers to the ruling of the Supreme Court of Yukon as a matter of international comity, and dismisses Plaintiff's Amended Complaint in its entirety. The Court need not address the remaining arguments raised by the Corporate Defendants in their Motion, or the separate grounds for dismissal raised by the Director Defendants in their Motion to Dismiss.

**SO ORDERED.**

SIGNED March 15, 2019.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**